UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION

| | |
|---|---|
| DAREL NICKIE DAVIS, ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 2:11-cv-00062 |
| v. ) | Judge Nixon/Brown |
| ) | |
| MICHAEL ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| Defendant. ) | |

To:   The Honorable John T. Nixon, Senior Judge

### REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB), as provided under Title II and Title XVI of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Record and Defendant's Response. (Docket Entries 11, 12, 13). The Magistrate Judge has also reviewed the administrative record ("Tr."). (Docket Entry 7). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED**.

### I. INTRODUCTION

Plaintiff filed an application for DIB and SSI on November 16, 2007 with an alleged onset date of January 1, 2004. (Tr. 88-97). Plaintiff's claims were denied initially and upon reconsideration. (Tr. 45, 54-55). A video hearing was held on December 1, 2009 before Administrative Law Judge ("ALJ") Joan Lawrence. (Tr. 23-43). At his hearing, Plaintiff amended his alleged onset date to January 1, 2007. (Tr. 27-28). The ALJ denied Plaintiff's application in a

decision dated March 21, 2010 (Tr. 11-22). Plaintiff's date last insured ("DLI") was December 31, 2009.

In her decision denying Plaintiff's claims, the ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2009.
2. The claimant did not engage in substantial gainful activity through the period from his alleged onset date of January 1, 2004 through his date last insured of December 31, 2009 (20 CFR 404.1571 *et seq.*).
3. Through the date last insured, the claimant had the following severe impairments: bipolar disorder; depression (20 CFR 404.1520(c)).
4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: mild limitations in her [SIC] ability to deal with the public, maintain attention/concentration, respond appropriately to changes in the work setting, work closely to others without undue distraction, complete a normal workweek and accept instructions/criticism appropriately.
6. Through the date last insured, the claimant was capable of performing past relevant work as an auto body pain [SIC] and repair. This work did not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).
7. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2004, the alleged onset date, through December 31, 2009, the date last insured (20 CFR 404.1520(f)).

(Tr. 14-22).

The Appeals Council denied Plaintiff's request for review on April 15, 2011. (Tr. 1-3). This action was timely filed on June 8, 2011. (Docket Entry 1).

## II. REVIEW OF THE RECORD

Plaintiff was born in 1963. (Tr. 26). He has an eighth-grade education and did not pursue

a GED. (Tr. 26). He was previous employed doing auto body paint work. (Tr. 27).

Plaintiff was hospitalized at Peninsula from February 10, 2007 through February 13, 2007. (Tr. 299-308). Plaintiff had been talking with a woman he met at the store on a regular basis without his wife's knowledge. (Tr. 303-04). That woman called Plaintiff's wife to tell her Plaintiff was suicidal and planning to shoot himself with a gun. (Tr. 304). He had loaded and cocked the gun to shoot himself when he called this woman. (Tr. 304). Plaintiff had no previous suicidal attempts or homicidal behavior. *Id*. He was admitted to Peninsula for worsening depression and suicidal thoughts. (Tr. 303). At intake, his GAF[1] was measured at 24. (Tr. 306). He stabilized on medication and had a GAF of 30 at discharge. (Tr. 299). No back pain was reported on Plaintiff's medical history. (Tr. 304, 308).

Plaintiff had a remote history of cocaine abuse, approximately 17.5 years before his admission. (Tr. 303). He also abused crystal methamphetamine approximately 1.5 years before his admission. *Id*. Plaintiff denied current abuse but was confronted with a positive drug screen after his admission to Peninsula. *Id*. At that point, he admitted abusing propoxyphene (Darvocet), buying it on the street and taking two per day. *Id*.

Plaintiff continued psychiatric care at Cumberland Mountain Mental Health Center. At his intake assessment on February 19, 2007, Plaintiff stated he uses illegal pain pills approximately

---

[1] The Global Assessment of Functioning test is a
subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). . . . A GAF of 41 to 50 means that the patient has serious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.
*Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 n. 1 (E.D.Mich.2005).

every other day due to pain in his shoulders for 1.5 years. (Tr. 353). His GAF was assessed at 45. (Tr. 356).

On March 30, 2007, Plaintiff sought treatment at Crossville Medical Group for shoulder pain. (Tr. 319). He described his pain as worse in the last month and thought he had been over-using his shoulders. *Id*. An exam revealed tenderness in both shoulders. *Id*. The physician advised no narcotics. *Id*.

At an appointment at Cumberland Mountain Mental Health Center on August 14, 2007, Plaintiff reported a motorcycle trip with his wife to Montana and noted they were planning an additional trip for the fall. (Tr. 331). He was described as "friendly, alert." *Id*. He felt better but continued to suffer from low mood, low motivation, and poor concentration. (Tr. 336). He also complained of sexual side effects from his medication. *Id*. Plaintiff had a similar report at his September 25, 2007 appointment. (Tr. 338). He had a relatively stable mood but was mildly more irritable and had difficulty sleeping. *Id*.

On October 18, 2007, Plaintiff's counselor described him as "alert, friendly." (Tr. 333). On November 6, 2007, he was irritable and periodically depressed. (Tr. 340). His MDQ screen was positive for bipolar disorder, although his sleep problems and sexual side effects had lessened. *Id*. His GAF was measured at 60. (Tr. 341).

Plaintiff's wife attended a session on November 13, 2007, where he was described as "sad, alert, not motivated to change." (Tr. 334). His agitation had improved by December 18, 2007, and the therapist noted he was "doing well at this time on depakote" and had a GAF of 60. (Tr. 343-44).

After Plaintiff reported racing and bizarre thoughts, his depakote dose was decreased. (Tr.

4

389). On the same date, February 13, 2008, Plaintiff's GAF was measured at 60. (Tr. 390). On March 25, 2008, Plaintiff stated he had not used illegal drugs since March 2007. (Tr. 384). He was irritable and had concentration and memory problems. *Id*. He stated he could not work and slept a lot. *Id*.

On May 5, 2008, Plaintiff's mood was described as "quite stable." (Tr. 402). He was sleeping and eating well, and his GAF was measured at 60. *Id*. This trend continued at appointments on July 24, 2008 (medication continues to work "quite well"), October 20, 2008 (good sleep and a normal appetite), April 15, 2009 ("remains stable on this medication combination and has been for some while"), July 13, 2009 (stable on medications), and October 8, 2009 (continues to do well, even mood, good sleep, minimal anxiety. (Tr. 449-84).

On February 12, 2009, Plaintiff complained of low back pain "that started really bad" this morning. (Tr. 466-67). The pain was radiating down both legs. *Id*. The physician at Crossville Medical Group recommended an MRI. *Id*. On March 26, 2009, Plaintiff reported that his insurance had denied coverage for his MRI, but he had seen a physician in Knoxville who ordered an MRI that showed disc disease in the last discs of the lumbar spine. (Tr. 468).

Plaintiff had an MRI on February 26, 2009 that showed a very slight levoscoliotic curvature of the lumbar spine on the supine view, increasing somewhat on the standing AP view but still mild in degree. (Tr. 490). There were no alignment abnormalities on the lateral view, and there might be a slight narrowing of the L1-L2 and L3-L4 discs. *Id*.

Plaintiff had a second MRI on March 25, 2009, at the University of Tennessee Medical Center. (Tr. 4889). It showed multilevel degenerative change, most severe at L3-L4, L4-L5, and L5-S1. *Id*.

5

Plaintiff first saw Dr. Kenneth Lister of the Specialty Surgery Center on April 20, 2009. (Tr. 487-88). Dr. Lister noted Plaintiff had low back and right leg pain, with a "long history of low back pain; usually goes out on him once a year; gradually worsening; been out for approximately 3 months; pain occasionally radiates down." (Tr. 487). He diagnosed lumbar degenerative disc disease with some herniation of the L5-S1 disc, lumbar spondylosis/Facet arthritis, and probable mild radicular symptomatology. (Tr. 488). He recommended epidural steroid injections but not surgery. *Id*.

Plaintiff had an epidural steroid injection on April 27, 2009. (Tr. 491). On May 18, 2009, Dr. Lister noted Plaintiff had a "positive but transient response to his epidural injection." (Tr. 492). His leg pain was significantly improved and only low back pain remained. *Id*. He recommended and performed lumbar facet injections. *Id*. On June 30, 2009, Plaintiff reported transient relief of about two weeks from the facet injections. (Tr. 493). Dr. Lister did not recommend any further injections and discussed nonsteroidal anti-inflammatory medications for relief. *Id*. He referred him back to his primary care provider. *Id*.

M. Jane Yates, Ph.D., performed a Psychiatric Review Technique and Mental RFC dated February 15, 2008. (Tr. 358-75). Dr. Yates believed Plaintiff had mild limitations in activities of daily living, and moderate limitations in maintaining social functioning and maintaining concentration, persistence or pace. She noted he had one or two episodes of decompensation. Dr. Yates believed Plaintiff had moderate limitations in the abilities to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting. *Id*.

DDS Medical Consultant Saul A. Juliao, M.D. performed an analysis of Plaintiff's medical records dated August 6, 2008. (Tr. 417-20). Dr. Juliao determined Plaintiff's physical impairments were not severe, either singly or combined. *Id*

P. Jeffrey Wright, Ph.D., performed a Psychiatric Review Technique and Mental RFC dated August 20, 2008. (Tr. 421-38). He noted Plaintiff has mild restrictions in activities of daily living and moderate difficulties in maintaining concentration, persistence, or pace and in maintaining social functioning. (Tr. 431). He believed Plaintiff is moderately limited in the abilities to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (Tr. 436).

At his hearing, Plaintiff testified he cannot work due to bipolar disorder, lower back problems, and a poor attention span. (Tr. 28). He testified his back pains started ten to fifteen years ago and progressively worsened. (Tr. 37). He has daily back pain. *Id*. Being with the public

7

interferes with him a lot, and that has happened for approximately two to three years. (Tr. 28).

He attempted suicide in 2007 and went into residential treatment at Peninsula for approximately 3-5 days. (Tr. 28-29). He was planning to shoot himself. (Tr. 29). He received counseling services at Cumberland Mountain. (Tr. 29). Plaintiff stated that medication helps some days but not all. (Tr. 30). He is afraid of changes in his medication making him unstable. (Tr. 35).

On a typical day, Plaintiff stays in his bedroom, sleeping or watching television. (Tr. 30). He has no patience for going to the store and standing in line and will have an anxiety attack. (Tr. 35). He does not go out, even on good days. *Id*. He cannot watch an entire television program. (Tr. 36). He does not sleep a full night but sometimes naps during the day. (Tr. 36-37).

Plaintiff abused cocaine and methamphetamine in the past, but has not been using those drugs since approximately 2005. (Tr. 32). Plaintiff stated that he has only taken what has been prescribed to him since that time. (Tr. 33).

Plaintiff takes hydrocodone for his back pain, which makes him groggy and unable to concentrate. (Tr. 37). He can walk or stand for fifteen minutes without having to sit or lie down. (Tr. 38). He can sit for, at most, fifteen to thirty minutes without having to change position. *Id*. The back pain radiates to his legs. (Tr. 38-39). Plaintiff tried epidural steroid injections, which provided a short period of relief, but the doctor recommended he not continue them. (Tr. 39). Plaintiff stated his doctor recommended a fused type surgery, but he was not sure if the diffuse nature of the problem indicated surgery. *Id*.

The Vocational Expert ("VE"), Edward Moffitt Smith, testified that Plaintiff has a history of heavy exertion level, skilled work. (Tr. 41). His skills are not transferable to light or sedentary

work. *Id*. The ALJ asked the VE if a hypothetical individual with Plaintiff's work history and education could perform Plaintiff's previous work if he had no exertional limitations but had limited but satisfactory or mild psychological problems in the areas of dealing with the public, maintaining attention and concentration, responding appropriately to changes in the work setting, working close to others without undue distraction, completing a normal work week, and accepting instructions and criticisms. (Tr. 41). The VE believed such an individual could perform Plaintiff's previous work. *Id*. If the hypothetical were altered but included exertional limitations limiting him to the medium exertional level, such an individual could perform Plaintiff's previous work. (Tr. 41). If the same hypothetical individual were restricted to the light exertional level, he could work as a parking lot attendant (700 jobs in Tennessee, 51,000 nationwide), as a quality control specialist such as a textile checker (1,400 jobs in Tennessee, 41,000 nationwide); or as a production assembler (20,000 jobs in Tennessee, 700,000 nationwide). (Tr. 42). If the hypothetical individual were unable to complete an 8-hour day on a regular basis either due to pain or to an inability to deal with work stress or people, the individual would be unemployable. *Id*.

### III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

In his Motion, Plaintiff alleges two errors. First, the ALJ erred in rejecting Plaintiff's credibility. Second, the ALJ erred in finding Plaintiff has no physical limitations. For the reasons set forth below, the Magistrate Judge believes the ALJ committed no error.

A.  <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The

purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.  Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1.  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2.  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3. If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4. If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5. Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.*; *see also Moon*, 923 F.2d at 1181. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through VE testimony. *See Wright*, 321 F.3d at *616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); *see also Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

---

[2] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

C.  The ALJ Properly Evaluated Plaintiff's Credibility

Plaintiff argues that the ALJ improperly assessed his credibility in violation of SSR 96-7p, 1996 WL 374186 (S.S.A. 1996). An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Like any other factual finding, an ALJ's adverse credibility finding must be supported by substantial evidence. *Doud v. Commissioner*, 314 F. Supp. 2d 671, 678-79 (E.D. Mich. 2003). Here, the Magistrate Judge believes the ALJ properly evaluated Plaintiff's credibility.

Here, the ALJ discounted Plaintiff's credibility based on his daily and social activities, the conservative treatment for both his back pain and metal health issues, and his drug use. Plaintiff argues that the ALJ discounted Plaintiff's statements regarding the severity of his pain solely because "these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 20). This is simply not the case. The ALJ noted Plaintiff has a history of drug abuse "as recent as February 2007." (Tr. 16). He denied drug use when he was admitted to Peninsula and only disclosed his drug use after confronted with a positive drug screen. (Tr. 20, 303). Plaintiff's back pain has been treated conservatively, and he apparently did not seek medical treatment for the pain before 2009. (Tr. 20, 466-68, 487-93). Plaintiff's mental complaints have been stable from approximately May 2008 through October 2009. (Tr. 402-484). His GAF was stable at 60 the entire time, and he responded well to treatment. *Id*.

Moreover, the ALJ noted that Plaintiff was able to maintain a social relationship outside

his marriage and could take care of his personal needs. (Tr. 20). It is also worth noting that Plaintiff and his wife were able to go on a motorcycle trip to Montana about 6 months after his hospitalization at Peninsula. (Tr. 331). The Magistrate Judge believes the ALJ had significant evidence for discounting Plaintiff's description of his limitations.

D. <u>The ALJ Properly Found Plaintiff Has No Physical Limitations</u>

Plaintiff argues that the ALJ should have found Plaintiff has physical limitations because Plaintiff submitted objective evidence, including the MRI and reports of steroid injections, showing he suffers from back problems. The ALJ clearly evaluated the medical records submitted by Plaintiff in support of this claim. (Tr. 17-20). She noted that Plaintiff's pain was controlled primarily with anti-inflammatory medications. (Tr. 17). In addition, as the ALJ noted, "[n]one of his treating physicians assigned any specific physical limitations to his ability to function and none opined that he was disabled due to physical impairments." (Tr. 20). As noted above, Plaintiff apparently did not seek treatment for his back pain prior to 2009, and his back problems were treated conservatively. Therefore, the Magistrate Judge believes the ALJ had significant evidence for her finding that Plaintiff has no physical limitations.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt

of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 4th day of April, 2012.

/S/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge